UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

**PREMIER FARNELL CORP., et al.,**

      **Plaintiffs,**

-v-

**DEWIGHT WALLACE, et al.,**

      **Defendants.**

Case No. 3:10-cv-055

Judge Thomas M. Rose

---

**ENTRY AND ORDER OVERRULING PREMIER FARNELL'S MOTION FOR A PRELIMINARY INJUNCTION (Doc. #7)**

---

The Plaintiffs in this matter are Premier Farnell Corporation ("Premier Corp.") and Premier Farnell Service Corporation ("Premier Service"), known collectively hereafter as "Premier Farnell". The Defendants are DeWight Wallace ("Wallace") and Johnstone Supply, Inc. ("Johnstone Supply").

Now before the Court is Plaintiffs' Motion for a Preliminary Injunction. (Doc. #7.) The Defendants have responded and the Plaintiffs have replied. The Parties have also submitted joint Stipulations of Fact. (Doc. #41.) A hearing on this matter was conducted on May 6, 2010, and the Parties have since submitted post-hearing briefs. Thus, this matter is now ripe for decision.

Plaintiffs seeks to enjoin Wallace from violating an Officer Employment Agreement between himself and Premier Service and a Severance Agreement between himself and Premier Corp. Premier Farnell also seeks to enjoin Johnstone Supply from continuing to employ Brian Klaus ("Klaus"). The Defendants respond that a preliminary injunction should not be granted because the agreements between Wallace and Premier Farnell were not breached and because Johnstone Supply has not tortiously interfered with any agreement between Wallace and Premier

Farnell.

## FACTUAL BACKGROUND

The following facts are summarized from the joint Stipulation of Facts submitted by the Parties (Doc. #41.):

Wallace is a former employee of Premier Farnell. He was employed by Premier Farnell on June 21, 2004. He was first assigned to the position of Vice President of Marketing and eCommerce at MCM Electronics, Inc.[1] ("MCM") and then to the position of President and General Manager. Wallace was later assigned to the position of President of Newark Electronics Corp.

Wallace's employment with Premier Farnell ended on October 31, 2009. He is currently employed with Johnstone Supply as its Chief Executive Officer.

Wallace signed an Officer Employment Agreement with Premier Service on October 29, 2008. He also signed a Severance Agreement with Premier Corp. on October 19, 2009.

The Severance Agreement required Premier Farnell to pay Wallace nine (9) months of severance pay and to pay up to $16,000 for outplacement services. Wallace acknowledged in the Severance Agreement that Premier Farnell had extended an interest-free loan in the amount of $45,681 to him which had not been repaid. As of January 15, 2010, Premier Farnell paid and/or provided the full value of the severance benefits and compensation owed to Wallace net of the amount of the interest-free loan.

Brian Klaus ("Klaus") is also a former employee of Premier Farnell having worked at

---

[1]MCM Electronics, Inc. is a wholly-owned subsidiary of Newark Electronics Corp. which is a wholly-owned subsidiary of Premier Corp.

MCM. He was first employed by MCM in October of 1999. He initially held the position of Sales and Marketing Analyst, later held the position of Director of eCommerce and later held the position of Manager of Marketing Campaigns and Analytics. Klaus resigned from MCM effective February 5, 2010, and began working as the Director of eCommerce at Johnstone Supply on February 8, 2010.

When Phil Minix ("Minix"), the President and General Manager of MCM, learned that Klaus was leaving MCM to accept a job working with Wallace, he ordered a review of the contents of Klaus' MCM email account. This review revealed email messages between Klaus and Wallace and Klaus and Johnstone Supply.

## RELEVANT LEGAL PROVISIONS

The purpose of a preliminary injunction is to preserve the relative positions of the parties until trial. *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Thus a party is not required to prove its case in full on a motion for a preliminary injunction. *United States v. Owens*, 54 F.3d 271, 276 (6th Cir. 1995).

When considering a motion for a preliminary injunction, the court considers four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury or the threat thereof without the injunction: (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007). These four factors are to be balanced, and are not prerequisites to be met. *Id.*

In this case, Premier Service and Wallace agreed to be bound by the law of Ohio.

Therefore, this Court will apply the law of Ohio when considering the four factors with regard to Premier Farnell's claim against Wallace.[2] *See Certified Restoration*, 511 F.3d at 541.

## LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiffs are seeking a preliminary injunction on two issues. First, they allege that Wallace has breached the Officer Employment Agreement and the Severance Agreement and seek to enjoin Wallace from future violations thereof. On this issue, Wallace says that he has not violated either of these agreements.

The second issue upon which Plaintiffs seek a preliminary injunction is their allegation that Johnstone Supply has tortiously interfered with the above mentioned contracts between Wallace and Premier Farnell. On this issue, the Plaintiffs argue that Johnstone Supply has not interfered with the Officer Employment Agreement and the Severance Agreement between Wallace and Premier Farnell.

The first factor to be considered is whether Premier Farnell has a strong likelihood of success on the merits of its claims. The alleged breach of contract will first be addressed.

### Breach of Contract

The Plaintiffs offer argument regarding the enforceability of employee non solicitation clauses. The Defendants do not offer argument at this time in response but do agree that the terms of the Officer Employment Agreement and the Severance Agreement are not in dispute. Therefore, the alleged breach of the employee non solicitation clause will be analyzed as a breach of contract.

To prove a breach-of-contract claim in Ohio, a plaintiff must show: (1) that a contract

---

[2]This matter is not disputed by the Defendants.

existed; (2) that the plaintiff fulfilled its obligations; (3) that the defendant failed to fulfill its obligations; and (4) that damages resulted from this failure. *J.J.O. Construction, Inc. v. Baljak*, No. 06AP-1300, 2007 WL 2309741 at *2 (Ohio Ct. App. Aug. 14, 2007).

There is no dispute that two contracts existed: the Officer Employment Agreement and the Severance Agreement. There is also no dispute at this time that Premier Farnell fulfilled its obligations. Damages, at least monetary damages, are not at issue at this time. What is currently at issue is the likelihood of Plaintiffs succeeding in showing that Wallace breached the agreements.

The Plaintiffs argue that Wallace violated the employee non solicitation and non inducement covenant included in both the Officer Employment Agreement and the Severance Agreement. The relevant portion of Wallace's Officer Employment Agreement provides that, during his employment by Premier Farnell and for two (2) years following such employment, Wallace will not solicit or induce or attempt to solicit or induce Premier Farnell employees and/or sales representatives to terminate their employment and/or representation of Premier Farnell. (Compl. Ex. A.) The relevant portion of Wallace's Severance Agreement reduces the period of time covered from two (2) to one (1) year after termination of employment and provides that Premier Farnell's oblibation to make payments under the Severance Agreement is contingent upon Wallace's compliance with the non solicitation provision in Wallace's Officer Employment Agreement. (Compl. Ex. B.)

Premier Farnell identifies several facts, in addition to the stipulated facts, that it says show that Wallace breached the non solicitation provision in the Officer Employment Agreement and the Severance Agreement:

On October 27, 2009, Klaus provided a favorable reference for Wallace regarding the Johnstone Supply CEO position. (Hrg. JX 14.)

Wallace received a letter from Frank Alexander, the chairman of Johnstone Supply's Board of Directors, offering him employment as the company's CEO. The record includes an unsigned offer letter dated December 4, 2009 (Affidavit of Katharine C. Weber ("Weber Aff.") Ex. 3 Apr. 7, 2010) and an unsigned offer letter dated December 10, 2009 (Hrg. JX 53).

A series of emails between Wallace and Klaus beginning on December 4, 2009 (Hrg. JX Ex. 16-24):

> At 7:45 a.m. on Friday, December 4, 2009, Wallace emailed Klaus to request that they reschedule a lunch appointment. (Compl. Ex. E.)
>
> At 10:44 a.m. on Monday, December 7, 2009, Klaus asked Wallace whether they had agreed to meet for lunch on Tuesday, December 8, 2009.
>
> At 5:48 a.m. on Tuesday, December 8, 2009, Wallace asked Klaus if they could meet for lunch at the Chop House at 11:30 a.m.
>
> At 9:13 a.m., Klaus agreed.
>
> At 9:26 a.m., Wallace cancelled the lunch stating that he needed to take his son to the doctor. Wallace asked to reschedule the lunch for the next day.
>
> At 2:20 p.m. on the next day, via email, Klaus provided a review of the capabilities and potential of the Johnstone Supply website. Klaus stated that the website "has a lot more potential" and that there was "a tone of opportunity here." Finally, Klaus stated, "Thanks again for lunch today and let me know the outcome. I would love the opportunity to work with you again!"
>
> At 8:21 p.m. on that same day, Wallace replied, "Brian, Thanks for the info. You are the man. I will keep you posted on how things go. Thanks also for your flexibility on the lunch schedule. It was good to see you and catch up on things. Talk to you soon. Dwight."

Shortly after Klaus learned that Wallace had been named Johnstone Supply's new CEO, Klaus scheduled a second luncheon for the purpose of convincing Wallace to help Klaus deliver his resume to the HR person at Johnstone Supply. (Hrg.)

On December 10, 2009, Wallace signed his Employment Agreement with Johnstone Supply (Hrg. JX 55.)

On January 5, 2010, Wallace requested that Premier Farnell pay the amount of his severance payments that had not yet been paid in one lump sum. (Hrg. JX 42.)

On January 7, 2010, Premier Farnell granted Wallace's request to be paid the remainder of Wallace's severance. (Hrg. JX 43.)

On January 11, 2010, Wallace began working for Johnstone Supply. (Hrg. JX 74.)

On January 12, 2010, Wallace discussed his vision for a new position that would manage Johnstone Supply's website with Johanna Glode ("Glode"), a Johnstone Supply human resources employee. (Hrg.) He then emailed Glode to request that she interview Klaus. (Hrg. JX 57.)

Wallace's request triggered a series of emails between Klaus and Glode (Compl. Ex. F; Hrg. JX 25-30):

> At 12:13 p.m. on Friday, January 15, 2010, Klaus emailed Glode to confirm details of Klaus's interview trip to Johnstone Supply's Portland, Oregon headquarters and to provide his resume. He stated, "I was thinking of getting a taxi from the airport to the hotel and office, do you think that is okay or should we make DeWight chauffer me around all day!"
>
> At 4:12 p.m. on Tuesday, January 19, 2010, Glode responded stating, "We'll plan on DeWight driving you around while you're here - I assume you have his contact information?" Attached to this email was a document entitled "Interview Schedule - Brian Klaus.docx." This document provided a schedule for Klaus' visit to Johnstone Supply on January 21, 2010. This document indicated that Wallace would pick Klaus up at the airport in the morning. Also, after the interviews, Wallace would take Klaus to lunch and back to the airport.

On January 15, 2010, Premier Farnell paid Wallace the amount of severance remaining to be paid under the terms of the Severance Agreement. (Declaration of Phil Minix ("Minix Decl.") ¶ 12 Feb. 8, 2010.)

On January 22, 2010, Klaus interviewed at Johnstone Supply. (Hrg. JX 30.) In a letter dated January 22, 2010, Klaus was offered a position at Johnstone Supply. (Hrg. JX 31.)

On January 25, 2010, Klaus notified MCM of his intention to terminate his employment at MCM effective February 25, 2010, and accept employment

elsewhere, (Hrg. JX 35.)

Minix learned that Klaus was going to work for Wallace at Johnstone Supply. (Minix Decl. ¶ 15.)

Klaus' last day of employment at MCM was February 5, 2010 and his hire date and Johnstone Supply was January 29, 2010. (Hrg. JX 35, 61.)

Based upon the above facts and the testimony at the hearing, the Court cannot conclude that Premier Farnell has a strong likelihood of success on the merits of its breach-of-contract claim against Wallace. The facts and argument cited by Premier Farnell show that Wallace and Klaus communicated on several occasions about Klaus going to work for Johnstone Supply. However, concluding that Wallace solicited Klaus to leave MCM from these facts would be making inferences beyond what is reasonable. From these facts that there is no evidence that Wallace ever **solicited** Klaus to go to work for Johnstone Supply.

The non solicitation clause prohibits Wallace from **soliciting** Klaus to terminate his employment at MCM. It does not necessarily prohibit Wallace from **communicating** with Klaus about leaving MCM or going to work for Johnstone Supply, nor does it prevent Wallace or Johnstone Supply from hiring a present or former Premier Farnell employee.

Klaus testified that he had become unhappy with his employment at MCM and decided to leave, and that he approached Wallace about going to work for Johnstone Supply. This was confirmed by Wallace's testimony. Klaus was interviewed by six Johnstone Supply employees, all of whom wanted to hire Klaus. The facts identified by Premier Farnell do not show otherwise.

### Tortious Interference With Contract

To recover on a tortious-interference-with-contract claim in Ohio, a plaintiff must prove: (1) the existence of a contract; (2) the wrongdoer's knowledge of the contract; (3) the

wrongdoer's intentional procurement of the contract's breach; (4) lack of justification; and (5) resulting damages. *Kenty v. Transamerica Premium Insurance Co.*, 650 N.E.2d 863, 866 (Ohio 1995).

The Parties do not dispute that there is a contract. They both agree that Wallace entered into the Officer Employment Agreement and the Severance Agreement. For purposes of this analysis, the Court will assume that Johnstone Supply was aware of Wallace's Officer Employment Agreement and the Severance Agreement. However, this is where the proof of tortious interference with contract ends. As determined above, Premier Farnell has not shown a strong likelihood of success on their claim that Wallace's Officer Employment Agreement and his Severance Agreement were breached. Thus, the Court cannot find that Premier Farnell has a strong likelihood of success on the merits of its tortious-interference-with-contract claim.

## IRREPARABLE INJURY

The second factor to be considered regarding whether to issue a preliminary injunction is whether the movant would suffer irreparable injury or the threat thereof without the injunction. In this case, Premier Farnell is the movant and the injunction they seek is to stop Wallace from breaching the terms of his Officer Employment Agreement and his Severance Agreement and to stop Johnstone Supply from further employing Klaus.

Premier Farnell first points to the irreparable-harm clause in Wallace's Officer Employment Agreement. However, this clause is operative only if Wallace breaches his Officer Employment Agreement and the Court has determined above that Premier Farnell does not have a strong likelihood of success on the merits of its breach-of-contract claim against Wallace.

Premier Farnell identifies alleged irreparable harm. The additional irreparable harm

identified by Premier Farnell is the cost of hiring a consultant to perform part of Klaus' duties, the loss of Klaus' former supervisor's time to perform the other part of Klaus' duties, the loss of Klaus' institutional knowledge and eCommerce experience, and the fact that Wallace's breach of the restrictive covenants may encourage other current or former Premier Farnell employees to breach their restrictive covenants.

However, Premier Farnell has already lost Klaus' services. Klaus has indicated that he no longer wishes to work at Premier Farnell. Further, he cannot be compelled to work there. The evidence indicates that Premier Farnell would incur the cost of having to replace Klaus regardless of whether or not an injunction was issued. Finally, as set forth above, Premier Farnell has not shown a strong likelihood of success on their claim that Wallace breached his restrictive covenants. In sum, Premier Farnell has shown no irreparable harm that could be addressed by the injunctive relief that they seek.

## SUBSTANTIAL HARM TO OTHERS

The third factor to be considered is whether issuance of the injunction would cause substantial harm to others. In this case, issuance of the injunctive relief that Premier Farnell seeks would cause substantial harm to Klaus, a non party to this lawsuit. Any injunction impairing Klaus' freedom to seek employment where he wishes and Johnstone Supply's freedom to employ Klaus would do far greater harm to Wallace and Johnstone Supply than any denial of injunctive relief would do to Premier Farnell. Premier Farnell's only argument as to the harm to Klaus is that Klaus knew and accepted the risk.

## PUBLIC INTEREST

The final factor to be considered is whether the public interest would be served by the

issuance of the injunction. In this case, the public interest would not be served by the issuance of the injunctive relief that Premier Farnell seeks.

The public interest would not be served by injunctive relief that would restrict the employment of Klaus, a non-party, and deny him his right to contract for his services with Johnstone Supply, who is a non-signatory to any agreement with Premier Farnell regarding Klaus' employment.

**CONCLUSION**

None of the factors to be considered weigh in favor of granting the injunctive relief that Premier Farnell requests. Premier Farnell does not have a strong likelihood of success on the merits of its claims against Wallace and Johnstone Supply. Premier Wallace has not shown that it will be irreparably harmed by any actions that Klaus and/or Wallace are legally entitled or required to take. There would be substantial harm to Klaus if the requested injunctive relief is granted, and the public interest strongly disfavors granting the requested injunctive relief.

Therefore, Premier Farnell's Motion for a Preliminary Injunction (doc. #7) is OVERRULED. The requested injunctive relief will not be granted.

**DONE** and **ORDERED** in Dayton, Ohio this Seventeenth Day of May, 2010.

> **s/Thomas M. Rose**
> _____
> THOMAS M. ROSE
> UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record